UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| JOSEPH WILLIAMS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 2:12-cv-218-WTL-MJD |
| ) | |
| DR. O'BRIEN, ) | |
| ) | |
| Defendant. ) | |

**Entry Discussing Motion for Summary Judgment**

Plaintiff Joseph Williams, a former inmate of the Putnamville Correctional Facility ("Putnamville"), brings this action alleging that defendant Dr. Paul O'Brien provided him with inadequate medical care by failing to recommend surgery for his rectal fistula.[1] Mr. Williams apparently brings an Eighth Amendment claim pursuant to 42 U.S.C. § 1983 and a claim for medical malpractice. Dr. O'Brien moves for summary judgment and Mr. Williams has not responded.

**I. Standard of Review**

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). If no reasonable jury could find for the non-moving party, then there is no "genuine" dispute. *Scott v. Harris,* 550 U.S. 372, 127 S.Ct. 1769, 1776, 167 L.Ed.2d 686 (2007).

---

[1] Put simply, a fistula is a hole where there is not supposed to be a hole.

As noted, Mr. Williams has not opposed the motion for summary judgment. The consequence of his failure to do so is that he has conceded the defendant's version of the facts. *Smith v. Lamz,* 321 F.3d 680, 683 (7th Cir.2003) ("[F]ailure to respond by the nonmovant as mandated by the local rules results in an admission."); *Waldridge v. American Hoechst Corp.,* 24 F.3d 918, 921–22 (7th Cir. 1994). This does not alter the standard for assessing a Rule 56(a) motion, but does "reduc[e] the pool" from which the facts and inferences relative to such a motion may be drawn. *Smith v. Severn,* 129 F.3d 419, 426 (7th Cir. 1997).

## II. Undisputed Facts

Applying the standards set forth above, the undisputed facts are as follows:

Dr. O'Brien started working at Putnamville on August 2, 2009. Dr. O'Brien was the Medical Director and treating physician at that facility. In addition to Dr. O'Brien, there was a nurse practitioner and at times another doctor. Nursing staff was responsible for scheduling offenders to see Dr. O'Brien. Dr. O'Brien had no involvement with scheduling offenders to see him within the prison.

When Mr. Williams arrived at Putnamville, he reported a history of an anal fistula which had been surgically repaired. He also reported a severe anal infection with gangrene that had to be debrided. During his time at Putnamville, Mr. Williams was enrolled in the Chronic Care Clinic for hypertension, which means he was seen by a provider at least every 12 weeks for that condition. He also took medication for hypertension.

On September 15, 2009, Mr. Williams submitted a Request for Healthcare asking for a medical follow-up for rectal bleeding. Mr. Williams was seen in nursing sick call on September 17, 2009 for this complaints. Dr. O'Brien examined him on September 30, 2009 and found prolapsed hemorrhoids, rectal bleeding, and anal leakage. He noted that Mr. Williams previously

had a rectal perianal infection from an abscess in the past that caused gangrene. Mr. Williams's sphincter tone was weak, as was his distal rectal wall. Dr. O'Brien noted that there were no signs of infection or abscess. Dr. O'Brien prescribed Anisole suppositories and ordered blood work. The treatment plan was to see if Mr. Williams improved over the next month before Dr. O'Brien decided if he needed a referral to a specialist. Mr. Williams had blood work done on October 21, 2009. On October 29, 2009, Dr. O'Brien reviewed Mr. Williams's lab work and ordered encouraged fluids, low fat diet with low protein, and continue to monitor for changes of borderline labs.

On November 12, 2009, Mr. Williams had additional lab work done. On November 28, 2009, Mr. Williams submitted a Request for Healthcare asking for a medical follow-up for his problem of rectal bleeding. Mr. Williams was seen in nursing sick call on November 29, 2009 for this complaints. Mr. Williams thought it was his hemorrhoids again, but the bleeding was getting worse. He said the treatment did not help and he asked to see the doctor. Mr. Williams was scheduled to see the doctor on December 1, 2009, but the appointment had to be cancelled because the facility was on lockdown. Dr. O'Brien examined Mr. Williams in the Chronic Care Clinic on December 2, 2009. Mr. Williams's blood pressure was doing well. He reported anal leakage and bright rectal bleeding. He reported that it might be another fistula, which he had surgery for in 2002 with a bad infection. Dr. O'Brien submitted a consultation request to send Mr. Williams to a proctologist for the possible fistula. Darla Scherb, the scheduling assistant at the prison, scheduled Mr. Williams' appointment with the general surgery team at Wishard Hospital on December 4, 2009. The providers at the prison had no control over when outside hospitals or clinics scheduled offenders. The prison was simply told when the specialist had an opening on his or her schedule. Offenders were not told of the date and time of their outside

appointments pursuant to Department of Correction's security policy. If an offender learned of the date and time of his appointment, that appointment had to be rescheduled pursuant to the Department of Correction's security policies. Mr. Williams submitted a Request for Healthcare on December 19, 2009, stating that he had not yet seen an outside physician.

Mr. Williams was evaluated by the general surgery team at Wishard Hospital on January 14, 2010 for fecal incontinence and bleeding. Mr. Williams reported difficulty controlling bowel movements when coughing or sneezing, as well as some bleeding with incontinence. He reported difficulty controlling bowel movements since his prior operation (fistulotomy). The specialist recommended three tests: a colonoscopy, an endorectal ultrasound, and manometry, with a referral back to general surgery once the studies were completed.

On February 10, 2010, Mr. Williams submitted a Request for Healthcare asking when he would be going back to Wishard Hospital for his medical problem of rectal bleeding. Medical staff responded that they were not aware that he had a follow-up visit and that they would check with the doctor. Dr. O'Brien submitted a consultation request for a colonoscopy and endoanal ultrasound with manometry on February 18, 2010. On February 26, 2010, Mr. Williams submitted a Request for Healthcare asking what treatment he was going to get for his condition. Medical staff responded that they would check on this for him.

Mr. Williams was placed in segregation by the correctional staff on March 2, 2010. Dr. O'Brien examined Mr. Williams in the Chronic Care Clinic on March 18, 2010. His vital signs were taken and his hypertension was doing well. Mr. Williams had no complaints about rectal issues. Dr. O'Brien renewed his bottom bunk pass for 6 months.

On April 29, 2010, Dr. O'Brien submitted a consultation request for an anorectal manometry and ordered procedure preparation for a colonoscopy. Mr. Williams went to IU

Health on May 6, 2010 for a lower endoscopic ultrasound and colonoscopy. The history Mr. Williams reported to the specialist was, "fecal incontinence. History of peri-rectal abscess that apparently progressed to a fistula in the past status post-surgical debridement vs. fistulectomy (per patient, no records). No known history of irritable bowel disease-the etiology behind his initial abscess/fistula is unclear. For the last 6 months he reports symptoms of leakage (refers to as incontinence). Occasional bleeding per rectum." The endoscopic ultrasound showed, "a few small-mouthed diverticula were found in the descending colon and in the ascending colon; the terminal ileum appeared normal; the rectum was normal; the perirectal space was normal; the internal and external anal sphincters appeared normal; and a moderate perianal fistula was found." There was no evidence of colitis or Crohn's disease. The recommendations from the specialist were for an anorectal manometry and a surgical consultation, if not already done.

On June 2, 2010, the nurse practitioner ordered a frequent bathroom pass for Mr. Williams. On June 15, 2010, Dr. O'Brien revised Mr. Williams' frequent bathroom pass to except count times. On June 26, 2010, Mr. Williams submitted a Request for Healthcare asking for the results of his recent testing. Mr. Williams was examined in the Chronic Care Clinic by the nurse practitioner on June 27, 2010. His vital signs were taken and he did not report any problems with rectal pain or bleeding.

On July 18, 2010, Mr. Williams submitted a Request for Healthcare asking why he had not been given his diagnosis from his recent tests. Medical staff responded that he would be scheduled with the provider. Dr. O'Brien examined Mr. Williams on July 30, 2010 and noted that Mr. Williams had one more test to be done before he could be reevaluated by general surgery. His vital signs were taken and he was not in any apparent distress. Mr. Williams was scheduled to see the nurse practitioner on August 9, 2010 to discuss his test results, but the

results were not available and she noted that she would research the issue and call the patient back.

Mr. Williams was examined at IU Health in the gastroenterology department on September 17, 2010 and had an ano-rectal manometry. The manometry showed, "mildly low resting pressures in the anal canal but the squeeze pressures are normal; the saline continence test is only minimally abnormal, a finding usually consistent with good squeeze strength; mild impairment of rectal sensation; no evidence of outlet obstruction constipation by defecation of water-filled lubricated balloons; clinical correlation of these findings is recommended." The gastroenterologist did not recommend any further specialty care, but recommended clinical correlation of the findings.

On October 23, 2010, Mr. Williams submitted a Request for Healthcare asking when he would receive the results of his testing at Indiana University. Medical staff responded that he was scheduled to see the doctor. Mr. Williams had an appointment to see Dr. O'Brien on November 5, 2010, but he did not show up for the appointment. Mr. Williams had an appointment to see Dr. O'Brien on November 9, 2010, but he did not show up for the appointment. Medical staff was then informed that Mr. Williams had moved to a different dorm and had not received his passes for his doctor's appointment, so he was rescheduled.

On November 11, 2010, Dr. O'Brien ordered a bottom bunk pass for 180 days and a frequent bathroom pass for 180 days. Mr. Williams was seen in the Chronic Care Clinic by the nurse practitioner on November 11, 2010 and his vital signs were taken. Mr. Williams reported that he had not taken his blood pressure medication that day. Mr. Williams did not complain of any rectal pain or bleeding.

Mr. Williams submitted a Request for Healthcare on December 9, 2010 asking when he would be returning to an outside physician for his medical condition. Medical staff responded that he saw the doctor on January 6, 2011 and the situation was explained. Dr. O'Brien examined Mr. Williams in the Chronic Care Clinic on December 20, 2010. His blood pressure was doing well and his vital signs were taken. Dr. O'Brien ordered blood work. On December 29, 2010, Mr. Williams submitted a Request for Healthcare about seeing an outside physician for his medical condition because he was experiencing extra bleeding. Mr. Williams was seen in nursing sick call on December 30, 2010 for complaints of rectal bleeding. He denied pain or discomfort, but reported bright red blood with his bowel movement. The nurse referred Mr. Williams to the provider.

Dr. O'Brien met with Mr. Williams on January 6, 2011 to discuss his test results and treatment plan. Based on the results of Mr. Williams's tests, which were only mildly abnormal, Dr. O'Brien did not think it was necessary at that time to send Mr. Williams back to general surgery for another consultation. Mr. Williams's tests were not significantly abnormal and his complaints of rectal bleeding and other issues were not consistent or severe. Dr. O'Brien had to correlate his clinical findings with the results of his diagnostic tests and determine whether any further work-up was necessary. Dr. O'Brien determined at that time based on Mr. Williams' complaints, his age and history, and his diagnostic findings, that further work-up was not necessary. That treatment plan was subject to change if Mr. Williams reported increased symptoms or different symptoms. Dr. O'Brien knew Mr. Williams did not have cancer or another serious medical issue because his diagnosis was a fistula. While this fistula was a nuisance to Mr. Williams, it was not life-threatening and not causing any physical, medical problems. Therefore, Dr. O'Brien had to balance Mr. Williams's symptoms with the risks of him

possibly having another surgery to fix the same problem. Dr. O'Brien's treatment plan therefore was to monitor Mr. Williams's symptoms until they got to a point where the risks of another surgery were outweighed by Mr. Williams's symptoms.

Dr. O'Brien examined Mr. Williams on April 4, 2011 in the Chronic Care Clinic. Mr. Williams's blood pressure was stable and his vital signs were taken. Mr. Williams made no complaints of rectal bleeding, pain or discomfort. Dr. O'Brien ordered a bottom bunk pass and frequent bathroom pass for 180 days and blood work. On May 3, 2011, Mr. Williams submitted a Request for Healthcare asking when he would see a physician again from Indiana University. In response, he was told that he would be rescheduled to see the provider. On July 2, 2011, Dr. O'Brien renewed Mr. Williams' chronic care medications. On July 24, 2011, Mr. Williams submitted a Request for Healthcare that he needed to see Dr. O'Brien for follow-up on his medical condition. Medical staff responded that he was scheduled to see the doctor. Mr. Williams had an appointment on August 1, 2011, but had to be rescheduled because there was an emergency in the healthcare unit. Dr. O'Brien examined Mr. Williams in the Chronic Care Clinic on August 2, 2011. Mr. Williams' blood pressure was doing well and was controlled with medication. His vital signs were taken. Mr. Williams did not complain of any rectal problems. Dr. O'Brien renewed Mr. Williams' bottom bunk pass and frequent bathroom pass for 180 days and ordered new lab work and an EKG.

On October 5, 2011, Mr. Williams submitted a Request for Healthcare asking about the status of the recommendation for a surgical consultation. Medical staff responded that his records were not noted in the computer and they asked him to sign a release for the records. On October 22, 2011, Mr. Williams was placed in segregation.

Dr. O'Brien left his position at Putnamville on November 24, 2011 and Dr. O'Brien's care of Mr. Williams ended at that time. Dr. O'Brien's treatment plan for Mr. Williams did not change because Mr. Williams never reported increased symptoms or different symptoms which would have caused him to reconsider whether he needed to be referred back to general surgery.

While Dr. O'Brien treated Mr. Williams during the relevant time period, Dr. O'Brien was a "qualified healthcare provider" under the Indiana Medical Malpractice Act. Mr. Williams has not filed a proposed complaint with the Indiana Department of Insurance and he has failed to comply with the requirements of the Indiana Medical Malpractice Act.

### III. Discussion

Dr. O'Brien moves for summary judgment on Mr. Williams' Eighth Amendment claim and his medical malpractice claim.

A. *Eighth Amendment*

The Eighth Amendment requires the government "to provide medical care for those whom it is punishing by incarceration." *Snipes v. Detella,* 95 F.3d 586, 590 (7th Cir. 1996) (*cert. denied,* 519 U.S. 1126 (1997) (quoting *Estelle v. Gamble,* 429 U.S. 97, 103 (1976)). In medical cases, the Eighth Amendment test is expressed in terms of whether the defendant was deliberately indifferent to the plaintiff's serious medical needs. *Williams v. Liefer,* 491 F.3d 710, 714 (7th Cir. 2007). "Accordingly, a claim based on deficient medical care must demonstrate two elements: 1) an objectively serious medical condition; and 2) an official's deliberate indifference to that condition." *Arnett v. Webster,* 658 F.3d 742, 750 (7th Cir. 2011). A medical condition need not be life threatening to qualify as "objectively serious"; it is enough "that a reasonable doctor or patient" would deem the condition "important and worthy of comment or treatment." *Hayes v. Snyder*, 546 F.3d 516, 523–24 (7th Cir. 2008) (quotation marks and citation

omitted). Deliberate indifference exists only when an official "knows of and disregards an excessive risk to an inmate's health; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 837 (1994). Reasonable doctors can disagree about the proper course of treatment for a patient without violating that patient's constitutional rights. Mere differences of opinion among medical personnel regarding the appropriate course of treatment for a patient do not give rise to deliberate indifference. *Estate of Cole v. Fromm,* 94 F.3d 254, 261 (7th Cir. 1996).

For purposes of the motion for summary judgment, Dr. O'Brien does not dispute that Mr. Williams had an objectively serious medical need to satisfy the first element of the deliberate indifference test. Dr. O'Brien argues, however, that his treatment of Mr. Williams does not qualify as deliberate indifference to this need sufficient to satisfy the second element. Subjective intent may be established by showing that the defendant had actual knowledge of impending harm that was easily preventable, such that conscious refusal to prevent the harm can be inferred from the defendant's failure to prevent it or showing that a defendant deliberately avoided acquiring knowledge of impending harm. *Jackson v. Duckworth*, 955 F.2d 21, 22 (7th Cir. 1992); *Patrick v. Staples,* 780 F. Supp. 1528 (N.D. Ind. 1991). Medical malpractice, negligence, or even gross negligence do not constitute deliberate indifference, nor does dissatisfaction or disagreement with a doctor's course of treatment. *Johnson v. Doughty*, 433 F.3d. at 1013; *Perkins v. Lawson*, 312 F.3d 872, 875 (7th Cir. 2002); *Dunnigan v. Winnebago County*, 165 F.3d 587, 592 (7th Cir. 1999); *Goka v. Bobbit*, 862 F.2d 646, 650 (7th Cir. 1988).

Dr. O'Brien had worked at Putnamville for approximately one month when he became aware that Mr. Williams complained of rectal bleeding. Within 15 days of his complaint, Dr.

O'Brien examined Mr. Williams and noted his previous history of a rectal fistula that had been surgically repaired. Dr. O'Brien also examined Mr. Williams's rectum and noted hemorrhoids and a weak sphincter tone. Dr. O'Brien prescribed medication for the hemorrhoids and ordered lab work to monitor the bleeding. His treatment plan was to monitor Mr. Williams for approximately one month to see if his symptoms resolved or became worse before he decided if a specialty referral was necessary. Pursuant to that treatment plan, Mr. Williams had two sets of lab work and when he complained again of rectal bleeding, Dr. O'Brien examined him again. During this exam, Dr. O'Brien referred Mr. Williams for a general surgery consultation due to his history and complaints.

Dr. O'Brien had no control over the timing of the surgical consultation, as it was scheduled by the outside provider. That general surgery referral resulted in a recommendation for three diagnostic tests to help determine whether Mr. Williams needed another surgery. Dr. O'Brien ordered the three tests recommended by the specialist. Over the next 7 months, Mr. Williams had each of the three recommended tests. The results of three tests recommended by the specialist were only minimally abnormal. Based on Mr. Williams's age, his history, his complaints, and his test results, Dr. O'Brien determined that it was not necessary to send him back to general surgery at that time. Dr. O'Brien weighed the risks of another possible surgery against Mr. Williams's complaints and symptoms. Dr. O'Brien could change his treatment plan based on Mr. Williams's reported complaints. Because Mr. Williams's complaints did not increase in frequency or severity, Dr. O'Brien's treatment plan did not change through the time Dr. O'Brien stopped working at the prison.

In short, Dr. O'Brien continuously evaluated and treated Mr. Williams's medical complaints. He did not ignore or disregard Mr. Williams's condition. He ordered the

recommended tests and made a reasoned decision based on those tests. In these circumstances, Mr. Williams cannot show that Dr. O'Brien was deliberately indifferent to his serious medical needs. This is so even though the general surgeon at Wishard Hospital initially recommended that Mr. Williams return once his diagnostic tests were complete, and that Dr. O'Brien did not order a return visit was medically necessary based on Mr. Williams's diagnostic tests results and subjective symptoms, does not constitute deliberate indifference because reasonable doctors can disagree on the proper course of treatment without exhibiting deliberate indifference to the patient's medical needs.

B. *Medical Malpractice*

Dr. O'Brien also argues that the Indiana Medical Malpractice Act precludes Mr. Williams's malpractice claim because Mr. Williams did not file a proposed complaint with the medical review panel.[2]

At the time of the events at issue, Dr. O' Brien was "qualified" healthcare provider under the Indiana Medical Malpractice Act, Ind. Code § 34-18-1, et. seq. That statute provides that an action cannot be brought against a qualified healthcare provider in court before the claimant's proposed complaint has been presented to a medical review panel established under and an opinion is given by the panel. *See* Ind. Code § 34-18-8-4. Mr. Williams has not filed a proposed complaint against Dr. O'Brien with the Indiana Department of Insurance. Because a medical

---

[2] Normally, when "all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on the merits." *Wright v. Associated Ins. Cos., Inc.*, 29 F.3d 1244, 1251 (7th Cir. 1994). One of the acknowledged exceptions to the general rule exits where it is clearly apparent how the state claims are to be decided. *Williams v. Rodriguez,* 509 F.3d 392, 404 (7th Cir. 2007); *Van Harken v. City of Chicago,* 103 F.3d 1346, 1354 (7th Cir. 1997) (where "an interpretation of state law that knocks out the plaintiff's state claim is obviously correct, the federal judge should put the plaintiff out of his misery then and there, rather than burdening the state courts with a frivolous case"). Because that is the case here, the Court will retain jurisdiction over Mr. Williams's state-law claims.

negligence case against Dr. O'Brien must first be presented to a Medical Review Panel pursuant to the Indiana Medical Malpractice Act, Mr. Williams's state-law claims against Dr. O'Brien must be dismissed.

## IV. Conclusion

For the foregoing reasons, Dr. O'Brien's motion for summary judgment [dkt 76] is **granted**. Judgment consistent with this Entry shall now issue.

**IT IS SO ORDERED.**

_William T. Lawrence_

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Date: 2/10/15

Distribution:

Joseph Williams
1513 Van Buren
South Bend, Indiana 46628

All electronically registered counsel